**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| THOMAS L. TAYLOR, III, § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | CIVIL ACTION H-12-2088 |
| § | |
| COMMUNITY BANKERS SECURITIES, LLC, *et al.*, § | |
| § | |
| *Defendants*. § | |

**MEMORANDUM OPINION & ORDER**

Pending before the court is defendants Community Bankers Securities, LLC, Waterford Investor Services, Inc, Allied Beacon Partners, Inc., AIC, Inc., and Richard E. Landi's (collectively, the "defendants") motion to compel arbitration or, in the alternative, to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. 11. After reviewing the parties' briefing, record, and applicable law, the defendants' motion to compel arbitration is **DENIED**. The defendants' alternative motion to dismiss is **DENIED WITHOUT PREJUDICE**.

**I. BACKGROUND**

On August 10, 2011, the Securities and Exchange Commission (the "SEC") commenced an enforcement action styled *Securities & Exchange Commission v. Evolution Capital Advisors, LLC, et al.*, Civil Action No. 4:11-cv-2945, in the United States District Court for the Southern District of Texas, Houston Division (the "Enforcement Action"). *See* Enforcement Action ("EA") Dkt. 1. The SEC alleged securities fraud with respect to two "Secured Note" offerings by Evolution Capital Advisors, LLC ("ECA"), Evolution Investment Group I, LLC ("EIGI"), and Damian Omar Valdez made between February 2008 and August 2010. EA Dkt. 42 at 1. Specifically, the SEC claimed that defendants made misleading and incomplete representations to potential investors, thereby

violating the Securities Act of 1933 and the Securities Exchange Act of 1934. *Id.* at 1, 4. Through the two offerings, ECA and EIGI (collectively, "Evolution") received approximately $10.1 million in investments from 82 investors. *Id.* at 5. The SEC also alleged that Evolution used $2.7 million from the proceeds of the second offering to make premium payments to the first offering's investors, in what the SEC characterized as "Ponzi" payments.[1] *Id.* According to the SEC, the alleged misrepresentations in the two offerings, along with the defendants' practice of taking "exorbitant" fees in the amount of $2.4 million over two years, created a "dire" financial situation for Evolution and, in turn, its investors. *Id.* As of December 31, 2010, Evolution's assets were at least $1.4 million less than the amount owed to its current investors. *Id.* at 5–6.

The SEC sought equitable relief in the form of preliminary and permanent injunctions against future violations of the securities law by Evolution, an asset freeze and the appointment of a receiver to take control of, marshal, and preserve Evolution's assets for the benefit of defrauded investors. *See* EA Dkts. 3–6. On December 22, 2011, after an October hearing on the request for injunctive relief, the court granted the request for injunctive relief and appointment of a receiver. EA Dkt. 42. The court held that Evolution perpetrated a fraudulent Ponzi scheme through two offers and sales of secured notes (the "Notes") to 82 members of the investing public (the "Noteholders"). *Id.* at 28

---

[1] As explained by the Fifth Circuit: "In a Ponzi scheme, a swindler promises a large return for investments made with him. The swindler actually pays the promised return on the initial investments in order to attract additional investors. The payments are not financed through the success of the underlying venture but are taken from the corpus of the newly attracted investments. The swindler then takes an appropriate time to abscond with the outstanding investments. As one author has described it, 'he borrowed from Peter to pay Paul. And it worked . . . until Peter got wise.' The scheme is named after its most famous practitioner, Charles Ponzi. Ponzi was an Italian immigrant who successfully bilked an unwitting American public out of millions of dollars in a scheme involving international postal reply coupons. Ponzi ran his swindle from the heart of Boston's financial district and continued to run the scheme for about a year before his empire collapsed all despite the fact that Ponzi knew little, if any, about international finance. Ponzi was eventually sentenced to prison and upon his release he was deported to Italy where the dictator Mussolini gave him a job in the finance ministry. Proving that swindle knows no geographic bounds, Ponzi escaped Italy to South America just before new charges could be brought against him. Ponzi died penniless in South America." *United States v. Cook*, 573 F.2d 281, 282 n.3 (5th Cir. 1978). For a fascinating account of Charles Ponzi's scheme, see J. NASH, BLOODLETTERS AND BADMEN 448–51 (1973).

("The SEC has presented compelling evidence that [Evolution's] current financial situation will permit the current investment strategy to succeed only if new investors are found whose money can be used to fund payments to the prior investors. This is the quintessential Ponzi scheme.").

On January 6, 2012, the court appointed Thomas L. Taylor, III, the plaintiff in this proceeding (the "plaintiff" or "receiver"), as Evolution's receiver. EA Dkt. 44. The court directed the receiver to locate, take control, and liquidate the receivership assets to maximize funds available for an equitable distribution to investors injured by the fraud alleged by the SEC. *Id.* Specifically, the court authorized the receiver "to institute such actions or proceedings to impose a constructive trust, obtain possession and/or recover judgment and/or compromise claims with respect to persons or entities who received assets or funds or proceeds traceable to investor monies. . . . The Receiver is specifically authorized to pursue such actions on behalf of and for the benefit of the constructive trust beneficiaries, including without limitation any and all investors who may be the victims of the fraudulent conduct alleged herein by the [SEC]." *Id.* at 6 ¶ 13.

Evolution sold the Notes to the Noteholders through FINRA- and SEC-registered brokerage firms and their registered representatives. Dkt. 1 at 2 ¶ 4. Community Bankers Securities, LLC ("CBS"), a registered firm, was the primary placement agent for the Evolution offerings. *See* Dkt. 14, Ex. A (Affidavit of Richard E. Landi ("Landi")) at 4 ¶ 12. CBS subcontracted with other brokers to offer Evolution promissory notes to prospective investors, and the contracts among CBS and the various sub-brokers, including defendant Waterford Investor Services, Inc. ("Waterford"),[2] contained agreements to arbitrate. *Id.* at 4 ¶ 13. The registered representatives also signed employment agreements with mandatory arbitration clauses. *Id.* at 4 ¶ 14. Further, according to Landi, "[e]ach

---

[2] In January 2011, Waterford changed its name to Allied Beacon Partners, Inc. ("ABP"). Dkt. 14, Ex. A at 4 n.1. ABP is also a named defendant in this action. Dkt. 1 at 5 ¶¶ 13–14.

3

and every customer of CBS and ABP, who invested in [Evolution], signed customer account opening forms and agreements that contain agreements to arbitrate."[3]  *Id.* at 4 ¶ 15.

For selling Notes to Noteholders, Evolution paid commissions and due diligence payments to the brokerage firms. Dkt. 1 at 2 ¶ 4. Defendants CBS and Waterford received $758,350.00 in payments related to the two offerings. *Id.* at 3 ¶ 6. The receiver demanded disgorgement of these fees, claiming that they were fraudulent proceeds of a Ponzi scheme. Id. at 2–3 ¶¶ 4–6. When the defendants did not comply, the receiver filed the instant action. *Id.* at 3 ¶¶ 6–7. The receiver states that he brings this action "on behalf of the constructive trust beneficiaries – the Evolution Noteholders – . . . in order to impose a constructive trust, obtain possession and/or recover judgment of Note Proceeds transferred from Evolution to defendants CBS and Waterford." *Id.* at 3 ¶ 7.

In response to the receiver's complaint, defendants moved to compel arbitration and argued that the receiver, who brings this action on behalf of Evolution investors, is bound to arbitrate the claims because the Noteholders "are customers of CBS, Waterford, and/or one of the unnamed 'brokerage firms' who offered [Evolution Notes]." Dkt. 11 at 4 ¶ 8. The receiver responds that the defendants have not shown that a valid arbitration agreement exists, nor have defendants shown that the receiver is a party to the arbitration agreements. Dkt. 13 at 2–5. Further, the defendants move to dismiss the receiver's complaint on several grounds for failure to plead claims governed by Virginia law under Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. Dkt. 11 at 4–10. Both motions are ripe for adjudication.

---

[3] Although Landi attached two examples of client agreements to his affidavit in support of the defendants' motion to compel, one of which contained an arbitration clause between the investor and brokerage firm, *see* Dkt. 14, Ex. D to Ex. A, defendants have made no showing that the investors from the example agreements are also Evolution Noteholders. Thus, the only record evidence that the Evolution Noteholders had arbitration agreements with CBS and/or ABP is Landi's testimonial statement quoted above regarding the arbitration clauses within customer agreements that were signed by "[e]ach and every customer of CBS and ABP, who invested in [Evolution]." *Id.*

4

## II. ANALYSIS

### A. Motion to Compel Arbitration

Courts use a two-step inquiry to determine whether an arbitration clause is enforceable as it relates to the dispute at hand. *See Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). First, courts must determine whether the parties agreed to arbitrate the dispute. *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002). Second, the court must examine "'whether legal constraints external to the parties' agreement foreclose[s] the arbitration of those claims.'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S. Ct. 3346 (1985)).

#### 1. *Did the Parties Agree to Arbitrate the Dispute?*

"While there is a strong federal policy favoring arbitration, the policy does not apply to the initial determination whether there is a valid agreement to arbitrate." *Banc One*, 367 F.3d at 429. In this case, the receiver claims that the motion should be denied because the defendants have offered no competent evidence of a valid arbitration agreement between the investors and brokers. Dkt. 13 at 2–4. Defendants respond that they have "clearly proven an agreement to arbitrate," citing Landi's affidavit in support of the motion to compel. Dkt. 14 at 2. Contrary to the defendants' assertions, however, their proof is not so plain.

Landi attached two client agreements to his affidavit, only one of which contained an arbitration clause for the court's review. *See* Dkt. 14, Ex. D to Ex. A. And because defendants did not produce any evidence that the investor who signed the arbitration agreement is also an Evolution Noteholder, the only evidence that any Noteholder entered into an agreement to arbitrate with the brokerage defendants is Landi's testimonial statement that every CBS and ABP client, including those who invested in the Evolution offerings, signed agreements with arbitration clauses similar to

the attached example. *See* Dkt. 14, Ex. A at 4–5 ¶ 15. However, this testimony is inadmissible under the Federal Rules of Evidence because the defendants have not made a threshold showing that the actual agreements between Noteholders and the brokers are unavailable and were not lost or destroyed in bad faith. FED. R. EVID. 1004; *see also Bituminous Casualty Corp. v. Vacuum Tanks, Inc.*, 975 F.2d 1130, 1132 (5th Cir. 1992). Without any competent evidence that an Evolution Noteholder entered into an enforceable arbitration agreement, defendants have not met their burden to demonstrate the existence of a valid agreement to arbitrate, and their motion to compel arbitration must fail.

Moreover, even if defendants had demonstrated enforceable arbitration agreements with their investor clients, they fail to establish the first consideration of the arbitration analysis for a separate reason. Defendants did not demonstrate that other Noteholders, who purchased Notes through a non-party brokerage, signed arbitration agreements with their brokers. And if the receiver represents the group of investors, he cannot be compelled to arbitrate claims of investors who have not been shown to be bound by an applicable arbitration agreement. *See Janvey v. Alguire*, No. 3:09-cv-724-N, slip op. at 8 n.7 (N.D. Tex. Aug. 26, 2011) (Godbey, J.) (explaining that the receiver for Stanford International Bank, who represented the creditors' interests, was not bound to arbitrate disputes covered by the investors' client agreements because "[e]ven if the Court assumed that the Client Agreement's arbitration provision applied to every former Stanford investor, not all of the Stanford Defendants' creditors were investors").

Lastly, because the court has determined that the parties do not have a valid agreement to arbitrate, the court need not consider whether there are any external legal constraints on arbitration. Defendants' motion to compel (Dkt. 11) is therefore **DENIED**.

**B. Motion to Dismiss**

Defendants also move to dismiss the receiver's complaint under Rule 12(b)(6). Dkt. 11 at 4–10. As a threshold issue, defendants assert that Virginia law applies to all claims in the complaint, arguing that the transfers to brokers were received and deposited in Virginia, and no Evolution offerings by CBS or ABP occurred in Texas. *See* Dkt. 14, Ex. A at 5 ¶ 16. The defendants do not, however, apply Texas's choice-of-law rules in a meaningful manner to arrive at the conclusion that Virginia law should apply to the substantive issues of this case, including the alter ego issue and the receiver's claims for fraudulent transfer and unjust enrichment. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020 (1941) (a court sitting in diversity applies the choice-of-law rules of the forum state); *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) (explaining that Texas applies the most-significant relationship test for choice-of-law questions, which "requires the court to consider which state's law has the most significant relationship *to the particular substantive issue to be resolved*") (emphasis in original); RESTATEMENT (SECOND) OF LAWS § 145(1) (1971) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, *with respect to that issue*, has the most significant relationship to the occurrence and the parties . . . .") (emphasis added). The receiver responds in kind, without analyzing the choice-of-law question for each issue, and contends that the court should apply Texas law to the entire case because defendants have not shown that the governing law should be different from the law of the forum. Dkt. 13 at 7–10 (citing *Janvey v. Alguire*, 846 F. Supp. 2d 662, 671 (N.D. Tex. 2011)).

The choice-of-law questions in this case are complex, and the most-significant relationship test may result in the application of different states' law to the substantive issues presented in the receiver's complaint. The court thus cannot evaluate these questions without the benefit of further

7

briefing from the parties. Defendants' motion to dismiss is **DENIED WITHOUT PREJUDICE**, and defendants are granted leave to refile a new motion to dismiss within twenty-one (21) days of the date of this order. If defendants file a renewed motion to dismiss that requires reference to state law for adjudication, the defendants must argue, with citation to appropriate authorities, which state's law applies to each substantive issue under Texas's choice-of-law rules.

### III. CONCLUSION

Pending before the court is defendants' motion to compel arbitration or, in the alternative, to dismiss under Rule 12(b)(6). Dkt. 11. The court finds that defendants have not met their burden to show that the parties entered into a valid contract to arbitrate the receiver's claims. The defendants' motion to compel arbitration (Dkt. 11) is **DENIED**. Defendants' alternative motion to dismiss the receiver's complaint (Dkt. 11) is **DENIED WITHOUT PREJUDICE**. Defendants shall file an answer or otherwise respond to the receiver's complaint within twenty-one (21) days of the date of this order.

It is so **ORDERED**.

Signed at Houston, Texas on December 19, 2012.

_____
Gray H. Miller
United States District Judge